AO 91 (Rev. 11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT

for the

Middle District of Florida

United States of America
v.
Stanley Staton

Defendant(s)

Case No. 8:17MJ1268 MAP

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of November 6, 2015 to present in the county of Polk in the Middle District of Florida, the defendant(s) violated:

| *Code Section* | *Offense Description* |
| --- | --- |
| 21 U.S.C. § 841(a)(1)<br>21 U.S.C. § 841(b)(1)(B) | Possession with intent to distribute 500 grams or more of a mixture and substance containg a detectable amount of cocaine, a Schedule II controlled substance, and a quantity of a mixture and substance containing a detectable amount of cocaine base, also known as crack cocaine. |

This criminal complaint is based on these facts:

See attached Affidavit

☑ Continued on the attached sheet.

[signature]
*Complainant's signature*

Joseph M. Boland, Special Agent, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 4/13/17

[signature]
*Judge's signature*

City and state: Tampa, Florida

Mark A. Pizzo, U.S. Magistrate Judge
*Printed name and title*

# AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Joseph M. Boland, being first duly sworn, hereby depose and state:

## A. INTRODUCTION

1. I submit this affidavit in support of a criminal complaint charging **Stanley Staton** (hereinafter "**STATON**") with possession with intent to distribute of 500 grams or more of a mixture and substance containing a detectable amount of cocaine, and a quantity of cocaine base, also known as crack cocaine, both Schedule II controlled substances, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B). The Federal Bureau of Investigation (FBI) and other law enforcement agencies are investigating this crime, which took place in the Middle District of Florida.

## B. PROFESSIONAL HISTORY

2. I have been a Special Agent with the Federal Bureau of Investigation (FBI) for the past seven years. I am currently assigned to the Lakeland Resident Agency of the Tampa Field Division, which is located in the Middle District of Florida. Through my training, education, and experience, I am familiar with the manner in which drug traffickers operate.

3. In connection with my official duties, I investigate criminal violations of federal laws, including but not limited to, 18 U.S.C. § 111 (assaulting, resisting, or impeding certain officers or employees) and 18 U.S.C. §§ 922 and 924 (firearm violations). On many occasions, I have participated in debriefing defendants, informants, and witnesses involved in violations of federal law. Additionally, I have testified in federal judicial proceedings relating to such investigations.

4. Accordingly, in connection with my official duties and as defined by 18 U.S.C. § 2510 (7), I am "an investigative or law enforcement officer of the United States," in that I am empowered by law to enforce violations of federal criminal laws and am duly authorized to swear to a complaint. See also Fed. R. Crim. P. 41(a)(2)(C).

5. The facts in this affidavit come from my personal observations, my training and experience, and information related to me by members of the FBI, Winter Haven Police Department ("WHPD"), and other law enforcement officers and witnesses. Because this affidavit is intended to show merely that there is sufficient probable cause supporting the requested complaint, it does not set forth all of my knowledge about this matter.

## C. INVESTIGATORY BACKGROUND

6. For at least the past year, I have been participating in the investigation of drug traffickers operating within the Middle District of Florida to commit violations of 21 U.S.C. §§ 841(a)(1) and 846 (involving the distribution of cocaine and conspiracy to commit the same). This investigation is being jointly conducted by the FBI, WHPD, Lakeland Police Department ("LPD"), and Haines City Police Department ("HCPD") under the OCDETF program.

7. Wage and hour reports from the Florida Department of Economic Opportunity indicate that STATON earned $125 in 2011 and $104 in 2012. He has no reported wages earned or hours worked prior to 2011 or after 2012.

8. The FBI first received information concerning the drug activities of STATON from a reliable confidential source ("CS-1"). CS-1, a long time user of cocaine who has a criminal history that includes convictions for possession and trafficking in cocaine, has been a confidential source for the FBI since approximately June 2015. Prior to

being a confidential source for the FBI, CS-1 spent approximately ten years serving as a confidential source for investigations conducted by the Polk County Sheriff's Office. CS-1 is paid for his/her activities on behalf of law enforcement and is not working to reduce or eliminate potential or pending charges. In total, CS-1 has been paid $8,500 over the years for his/her work with law enforcement. Law enforcement officers have corroborated the information that CS-1 has provided in this investigation, and it has proven credible and reliable. CS-1 is willing to testify in court regarding his/her law enforcement activities.

### D. PROBABLE CAUSE—BASIS FOR SEARCH WARRANTS

9. CS-1 conducted controlled purchases of powder cocaine from **STATON** on seven occasions, beginning on November 6, 2015 and most recently on March 15, 2017. Based on law enforcement observations of these seven controlled purchases, surveillance of **STATON**, and information conveyed to law enforcement officers by CS-1, **STATON** utilizes at least three locations to store, process, and distribute narcotics:

a. 320 Avenue U Northeast, #01, Winter Haven, FL 33881 (hereinafter "**Target Location #1**"), which is a residence;

b. 221 Avenue T Northeast, Winter Haven, FL 33881 (hereinafter "**Target Location #2**"); which is a food service business operating under the name "Rainbow Foods");

c. 2137 Lucerne Park Road, Winter Haven, FL 33881 (hereinafter "**Target Location #3**"), which is a residence; (collectively, the "**Target Locations.**)

10. Specifically, **STATON** appears to use **Target Location #1** and **Target Location #2** as his primary narcotics sales locations. Five of the seven controlled purchases by CS-1 from **STATON** occurred either inside **Target Location #1**, inside **Target**

**Location #2**, or in the parking lot of **Target Location #2**. Each controlled purchase was audio and video recorded.

11. **STATON** appears to use **Target Location #3** as a stash house, meaning a place to store his narcotics supply and/or proceeds from narcotics sales. According to CS-1, **STATON** utilizes **Target Location #3** as a location to store drugs as well as to process powder cocaine into crack cocaine. On November 6, 2015, September 23, 2016, and March 15, 2017, law enforcement officers observed **STATON** going to and from **Target Location #3** immediately before conducting controlled sales of cocaine to CS-1. Moreover, on December 20, 2016, law enforcement officers conducting surveillance of **Target Location #3** observed **STATON** visit **Target Location #3** four times in a five-hour span, only staying for a short time on each visit.

12. Each of the seven controlled narcotics purchases by CS-1 from **STATON** unfolded similarly. CS-1 initiated each narcotics transaction by contacting **STATON**, informed **STATON** of the quantity of cocaine he/she wished to purchase, and requested a price. On each occasion, **STATON** named a price and instructed CS-1 where to meet him. On each occasion, law enforcement officers searched CS-1 for currency and contraband prior to the meet. On each occasion, law enforcement officers then provided CS-1 with an amount of U.S. currency and a recording device. On each occasion, **STATON** personally met CS-1 at the specified location and handed CS-1 the agreed upon amount of cocaine in exchange for the agreed upon amount of U.S. currency. After each transaction, CS-1 rendezvoused with law enforcement officers at a preset location and handed over the cocaine purchased from **STATON**, as well as the remaining U.S. currency. On each occasion, law enforcement officers searched CS-1 after the deal and found no additional

drugs, money, or contraband. On each occasion, the substance purchased by CS-1 from **STATON** tested positive for the presence of cocaine.

13. The seven controlled purchases occurred on the following dates and under the following additional circumstances:

a. **November 6, 2015**: CS-1 placed a consensually monitored and recorded telephone call to **STATON** on his cellular telephone, (863) 288-7084.[1] CS-1 told **STATON** that he/she wanted to get an "8 ball," a commonly used slang term that I know referred to an eighth of an ounce of cocaine, based on my training, experience, and knowledge of the investigation. **STATON** advised CS-1 to come to "R" in 10 minutes. According to CS-1, based on his prior dealings with **STATON**, he understood the reference to "R" to mean the residence located at 821 Ave R NE, Winter Haven, FL 33881. A short time later **STATON** called CS-1 from (863) 288-7084 and directed CS-1 to meet at **Target Location #3** instead of "R." Shortly after that phone call, law enforcement officers conducting surveillance observed **STATON** enter **Target Location #3** and exit moments later, driving away in a white Ford F-150 truck. **STATON** then traveled back to 821 Ave R NE, Winter Haven, FL 33881. Meanwhile, FBI Special Agent ("SA") Michael Parmigiani, TFO Danny Peters, and TFO Kristy Lastinger watched CS-1 drive to **Target Location #3**. CS-1 attempted to make contact with **STATON** at **Target Location #3** as previously directed

[1] The subscriber for this cellular telephone number provided his name as "Jack Daniels" and his address as 2267 5th Street, Winter Haven, FL, which corresponds to a vacant lot.

during the consensually recorded telephone call. After no response at **Target Location #3**, CS-1 conducted a consensually recorded telephone call to **STATON**, who told CS-1 to meet back at "R" instead. SA Parmigiani, TFO Peters, and I observed CS-1 arrive at and enter 821 Avenue R NE, Winter Haven, FL 33881. According to a debrief of CS-1, while inside the residence, CS-1 observed **STATON** in possession of a handgun and what appeared to be multiple ounces of powder cocaine next to him on a couch. CS-1 handed **STATON** $200. In exchange, **STATON** gave CS-1 what appeared to be an eighth of an ounce of cocaine as well as $10 change. According to field testing, the substance CS-1 purchased from **STATON** cocaine weighed approximately 4.35 grams, which is equal to approximately an eighth of an ounce plus the packaging weight.[2]

b. <u>May 26, 2016:</u> CS-1 made a consensually monitored and recorded telephone call to **STATON** at 863-288-7084 and requested "a half," which I know referred to a half-ounce of powder cocaine, based on my training, experience and knowledge of the investigation. **STATON** quoted a price of $600 and directed CS-1 to meet him at "Bedrock," which CS-1 informed law enforcement officers that he/she knew to mean **Target Location #1**. CS-1 met **STATON** at **Target Location #1** and received 15 grams of powder cocaine from **STATON** in exchange for $625. While

---

[2] Since the date of the controlled narcotics purchase on November 6, 2015, the residence at 821 Ave R NE, Winter Haven, FL 33881 was condemned and is no longer being operated by **STATON**.

inside **Target Location #1**, CS-1 observed **STATON** "bagging up" what appeared to be several ounces of powder cocaine and "cutting up cookies." Based on my training, experience, and knowledge of the investigation, I understand "bagging up" means packaging for distribution and "cutting up cookies" means breaking up crack cocaine into smaller pieces for distribution. Additionally, while inside **Target Location #1**, CS-1 also observed **MAY** conducting similar drug transactions with other buyers.

c. **June 23, 2016**: CS-1 placed a consensually monitored and recorded telephone call to **STATON** on his cellular telephone, (863) 288-7084. CS-1 told **STATON** that he/she wanted to purchase an "8 ball" and that he/she was available to meet. **STATON** directed CS-1 to go to "the store," which CS-1 understood to mean Rainbow Foods (**Target Location #2**), and stated that the cocaine would cost $180. TFO Lastinger and I observed CS-1 arrive at **Target Location #2**, where he/she immediately made contact with **STATON**, who directed CS-1 to the passenger side window of a white Mazda that is registered to **STATON**'s mother. **STATON** was sitting in the front passenger seat of the vehicle; **HARRIS** was sitting in the driver's seat. **STATON** gave CS-1 cocaine in exchange for $180. Law enforcement officers conducting surveillance observed that **STATON** was already at **Target Location #2** when CS-1 called to arrange the transaction. Law enforcement officers conducting surveillance

further observed that **STATON** never left **Target Location #2** between the time of CS-1's initial phone call and the conclusion of the transaction, at which point surveillance of **STATON** was terminated. DEA chemists determined that the substance purchased by CS-1 from **STATON** contained approximately 3.5 grams of cocaine.

d. **September 23, 2016:** CS-1 made a consensually monitored and recorded telephone call to **STATON** at (863) 288-7084 and requested "three whole ones." Based on my training, experience, and knowledge of the investigation, I know that CS-1 was referring to three ounces of powder cocaine. **STATON** quoted a price of $1,125 per ounce and directed CS-1 to meet him at "Bedrock," a.k.a. **Target Location #1**. Officers surveilling **STATON** observed that immediately after the phone call with CS-1, **STATON** traveled to **Target Location #3**, entered **Target Location #3**, exited **Target Location #3**, and then drove straight to meet CS-1 at **Target Location #1**. CS-1 met **STATON** at **Target Location #1** and received 60 grams of powder cocaine from **STATON** in exchange for $2,645. While inside **Target Location #1**, CS-1 observed that **STATON** was in possession of several ounces of cocaine.

e. **November 3, 2016:** CS-1 traveled to **Target Location #1** to purchase cocaine. **HARRIS**, who was inside **Target Location #1**, informed CS-1 that **STATON** was not present but that he would go and report that CS-1 wished to buy cocaine. **HARRIS** instructed CS-1 to wait at **Target**

**Location #1**, but before leaving, **HARRIS** attempted to sell powder cocaine to CS-1 from a kitchen drawer. **HARRIS** did not complete the sale, however, as he expressed hesitation about conducting a sale without **STATON's** knowledge. **HARRIS** then left to get **STATON**. After tiring of waiting, CS-1 made a consensually recorded call to **STATON** on his cell phone. **STATON** agreed to meet CS-1 at **Target Location #1** to sell CS-1 "an onion." Based on my training, experience, and knowledge of the investigation, I know that "an onion" refers to one ounce of cocaine. **STATON** arrived at **Target Location #1** moments later in a white Ford truck, likely the same Ford F-150 truck described in Paragraph 20(a) above, but did not exit the vehicle. CS-1 walked out of **Target Location #1** and approached the vehicle, where it was parked on the street in front of **Target Location #1**. Through the window, while he was sitting in the vehicle and CS-1 was standing outside of it, **STATON** handed 30.8 grams of cocaine to CS-1 in exchange for $1,200.

f. **December 19, 2016:** CS-1 made a consensually monitored and recorded telephone call to **STATON** at (863) 288-7084 and requested "two whole ones." Based on my training, experience, and knowledge of the investigation, I know that CS-1 was referring to two ounces of cocaine. **STATON** quoted a price of $1,100 per ounce and directed CS-1 to meet him at "Bedrock" (**Target Location #1**) in thirty minutes. Shortly thereafter, **STATON** called CS-1 back and instructed him/her to meet at

"Rainbow" instead, which CS-1 informed law enforcement officers that he/she knew to mean **Target Location #2**. SA Greg Spieker and TFO Christopher Madden observed CS-1 arrive at **Target Location #2**, where he/she met **STATON** in the parking lot, just as he/she did on June 23, 2016. **STATON** escorted CS-1 inside **Target Location #2** through a side door at the back northeast corner of the building and requested the $2,200, which CS-1 gave to him. CS-1 then observed **STATON** exit **Target Location #2** and step into a white Volvo parked in the parking lot, where **STATON** briefly interacted with an unknown person. Moments later, **STATON** exited the vehicle and provided CS-1 with 56.83 grams of cocaine wrapped inside of a brown paper bag.

g. **December 20, 2016:** TFO Lastinger conducted surveillance of **STATON** by using cameras mounted on street poles outside of **Target Location #2** and **Target Location #3**:

   i. At approximately 11:15 a.m., TFO Lastinger saw **STATON** leave **Target Location #2** and travel in the direction of **Target Location #3**. I saw **STATON** arrive at **Target Location #3** in a timeframe indicating that he drove directly from **Target Location #2** to **Target Location #3**. Approximately thirty minutes later, at 11:46 a.m., **STATON** left **Target Location #3** and traveled back to **Target Location #2**.

ii. At approximately 12:11 p.m., a silver sedan driven by a male matching the physical description of **HARRIS** and carrying one unidentified passenger left **Target Location #2** and drove to **Target Location #3**. The driver, who appeared to be **HARRIS**, and the passenger met **STATON** at **Target Location #3**. At approximately 12:28 p.m., the silver sedan left **Target Location #3** being driven by the person who had arrived as a passenger with the man who appeared to be **HARRIS** and traveled back to **Target Location #2.** At approximately 1:45 p.m., **STATON** left **Target Location #3** and drove back to **Target Location #2**.

iii. At approximately 2:00 p.m., **STATON** returned to **Target Location #3**. At approximately 3:47 p.m., **STATON** left **Target Location #3** and traveled back to **Target Location #2.**

iv. At approximately 3:52 p.m., **STATON** left **Target Location #2** and returned to **Target Location #3**.

v. Each time **STATON** traveled between **Target Location #2** and **Target Location #3** on December 20, 2016, he used the same white Ford F-150 referenced in Paragraphs 20(a) and 20(e) above.

vi. Based on my training, experience, and knowledge of this investigation, **STATON**'s frequent travel between **Target Location #2** and **Target Location #3**, and the short amount of time he

spends at **Target Location** #3 each time he visits it, is consistent with a drug trafficking organization continuously using a stash house to supply street level narcotics transactions.

h. **February 24, 2017:** CS-1 placed a consensually monitored and recorded telephone call to **STATON** at (863) 288-7084. CS-1 told **STATON** that he/she wanted "2 hard ones," which I know means two ounces of crack cocaine, based on my training, experience, and knowledge of this investigation. **STATON** provided a price of $1,000 per ounce and directed CS-1 to go to **Target Location #2**. TFO Lastinger saw **STATON** depart **Target Location #2** prior to CS-1 arriving at the location. SA Alfonso and I saw CS-1 arrive at **Target Location #2.** An unidentified individual told CS-1 that **STATON** had departed the area due to a lot of law enforcement in the area. CS-1 placed a consensually recorded telephone call to **STATON** at (863) 288-7084. **STATON** told CS-1 to meet at the boat ramp on Sears Ave NE in Winter Haven, FL. SA Alfonso and TFO Lastinger observed **STATON** travel to the boat ramp on Sears Avenue in an orange Ford Edge. Based on my training and experience, I know that it is common for drug traffickers, as a security precaution, to tell individuals to go to a particular location to conduct a narcotics purchase and then to change the location when the individual arrives. When CS-1 arrived at the boat ramp, he/she approached the driver's side of the orange Ford Edge. CS-1 gave **STATON** $2,000 and in

return **STATON** gave CS-1 two ounces of crack cocaine. The field weight for the purchased crack cocaine was approximately 59.65 grams. Immediately after the deal, SA Alfonso watched **STATON** drive from the boat ramp to **Target Location #2**.

i. March 15, 2017: Agents directed CS-1 to conduct a controlled purchase of cocaine at **Target Location #1**. CS-1 traveled to **Target Location #1** without first contacting **STATON** or one of his associates. When CS-1 arrived at **Target Location #1**, he/she was approached by **MAY**. CS-1 told **MAY** that he/she wanted a "ball," which I know refers to an "8 ball" or an eighth of an ounce, based on my training, experience, and knowledge of the investigation. **MAY** told CS-1 that she did not have any cocaine at **Target Location #1** and that **STATON** was keeping everything at the "store," which CS-1 understood referred to **Target Location #2**. CS-1 then placed a consensually recorded telephone call to **STATON** at (863) 288-7084. CS-1 told **STATON** that he/she was at "Bedrock" and wanted to purchase a "half" for $500. **STATON** agreed to make the sale to CS-1 and said he would bring the cocaine to "Bedrock," but told CS-1 that he/she would still owe him $30. Shortly after the phone call with CS-1, SA Timothy Pent and TFO Lastinger observed **STATON** arrive at **Target Location #3** in the same white Ford F-150 truck referenced in Paragraphs 20(a), (e), and (g)(v) above. **STATON** entered **Target Location #3** and exited minutes later. SA Pent, TFO Lastinger, and I

then observed **STATON** drive straight to **Target Location #1** to conduct the deal with CS-1. When **STATON** arrived at **Target Location #1**, CS-1 approached the passenger side door of the white Ford F-150 and gave STATON $500. In return, **STATON** gave CS-1 a half ounce of powder cocaine. After the deal, TFO Lastinger and I observed **STATON** leave **Target Location #1** and drive directly to **Target Location #2**. The field weight for the purchased powder cocaine was approximately 13.44 grams.

14. Based on the facts of the seven controlled narcotics purchases conducted by CS-1 and the surveillance conducted by law enforcement officers as described herein, on April 6, 2017, Magistrate Judge Amanda Sansone issued search warrants for the **Target Locations.**

**E. PROBABLE CAUSE – SEARCH WARRANT RESULTS**

15. On April 12, 2017, at approximately 4:30 PM, law enforcement officers executed the search warrants at each of the **Target Locations** simultaneously .The following evidence was recovered:

a. **Target Location #1**: Upon entry, law enforcement officers observed that a woman was the only person inside the residence and that she was sitting on the couch with a red shopping bag open in front of her. The woman immediately and spontaneously stated, "I know why you guys are here. People I used to hang out with have drugs inside the house." Inside the shopping bag, law enforcement officers found a firearm – a Kel-Tec pistol, model P32 – loaded with five rounds of .32 caliber ammunition, as well as

other personal items without evidentiary value. The woman immediately claimed that the gun belonged to a co-conspirator (not **STATON**) that he had just left, and that she had forgotten the gun was there. Also in front of the couch, law enforcement officers found a glass pipe with what appeared to be cocaine residue and a heart shaped box. The box contained multiple small plastic bags containing a powder substance that appeared to be cocaine and one rock-like substance that appeared to be crack cocaine. A field test confirmed the powder substance was cocaine, while the rock-like substance field-tested positive for crack cocaine; the total package weight was 26.3 grams. Beside the couch, law enforcement officers found multiple empty small plastic bags and a digital scale. Officers found a second digital scale in one of the bedrooms. After receiving *Miranda* warnings and waiving her rights, the woman admitted to possessing the cocaine.

b. **Target Location #2**: As SWAT personnel secured the perimeter, a law enforcement officer observed **STATON**, who was outside the store, throw an object onto the roof of the building and run inside. Officers then detained **STATON**, his girlfriend, Marteena McCray, and three males who were standing next to the building. When a law enforcement officer climbed onto the roof, he found a black glove, inside of which were multiple small plastic bags, some of which appeared to contain powder cocaine and some of which appeared to contain crack cocaine. The total package weight of the glove, with the plastic bags of suspected narcotics

inside, was 117.65 grams. A drug detecting dog examined the store and the two cars in the parking lot, a white Ford truck and an orange Ford Edge. The dog alerted to both vehicles and to the back room of the store. Inside the back room of the store, officers found a box containing a package of plastic zip lock bags, a small plastic bag containing a white powder substance that appeared to be cocaine weighing 38.25 grams, and a scale with a white powder residue suspected of being cocaine. Also in the back room of the store, stashed in a storage area between the top of the wall and the ceiling, a law enforcement officer found a firearm – a Smith & Wesson Sigma model nine millimeter handgun – loaded with fifteen rounds of nine millimeter ammunition. Finally, inside the Ford Edge, which is registered to McCray, officers found a purse containing six plastic bags containing a white powder substance that appeared to be cocaine, registering a package weight of 44.95 grams; $340 in cash; and McCray's identification card.

c. **Target Location #3**: Upon entry, law enforcement officers found the residence unoccupied. Inside the second bedroom, law enforcement officers discovered multiple "bricks" of a tightly packed white powder substance wrapped in black plastic bags. Field tests of the "bricks" for cocaine were inconclusive, but based on the visual appearance of the substance and the physical feel, as well as their training and experience, the officers believed the substance to be cocaine. The total package weight of these "bricks" was approximately 846 grams. In the kitchen, law

enforcement officers found multiple small plastic bags containing a white powder substance that appeared to be cocaine, registering a package weight of 134.95 grams; a small plastic bag containing a white rock-like substance that appeared to be crack cocaine, registering a package weight of 61.1 grams; two glass cooking pots covered in white powder residue, suspected to be cocaine; and at least five digital scales covered in white powder residue, suspected to be cocaine. In the back bedroom, officers found multiple small plastic bags containing a white powder substance that appeared to be cocaine registering a package weight of approximately 298.65 grams, as well as small plastic bags containing a green leafy substance that appeared to be marijuana registering a package weight of 228.9 grams. Field tests of the above-described substances were positive for the presence of cocaine.

## F. CONCLUSION

16. For the reasons set forth above, I believe that probable cause exists to believe that **STATON** violated Title 21, United States Code, Sections 841(a)(1) and (b)(1)(B), possessing with intent to distribute 500 grams or more of a mixture and substance

containing a detectable amount of cocaine and a quantity of a mixture and substance containing a detectable amount of cocaine base, also known as crack cocaine.

Joseph M. Boland, Special Agent
Federal Bureau of Investigation

Sworn to and subscribed before me
this 13 day of April, 2017, in Tampa, Florida.

MARK A. PIZZO
United States Magistrate Judge